24-537 Neville, Rodie and Shaw v. E.A. Prescott-Legard This is Charles Doherty of Dentons for the appellate in this case. We're before the court on Judge Bolden's consideration of two dueling motions on the pleadings for judgment on the pleadings and the issue in the case concerns a buyout provision in a Knight 2003 shareholder agreement and whether the obligation to purchase puts on us an obligation to sell. We represent, I represent the Prescott-Legard, who's the executor of his father's estate, Edwin Legard, who, who was the deceased, who, who died and his shares are at issue here. And the question is whether we're entitled to hold on to these shares. Is there any, is there any dispute that if while the senior Mr. Legard had lived, while he was still alive, that if he left the company for any reason he would not be entitled to keep the shares or to sell them outside of the company? I think that consistent with our argument on, on the sale at death, he would have the ability not to sell those. So. And that's all, it's all because the contract is, the agreement is lacking in any restriction on the shareholder to sell. So let me, let me ask about that because you focus a lot on the, the obligation to purchase and say well that doesn't mean there's an obligation to sell. But when I look at the, the agreement and I'm looking at 830 in the appendix, before you even get to the discussion of what happens on death of a shareholder, it says no shareholder or legal representative in restricted categories A, B, or C below, A being the shareholder who's deceased, their representative, shall be permitted to continue to own or to assign, sell, or pledge shares of common stock unless the corporation or other shareholders fail to purchase such shares of common stock. That, that suggests to me very clear language. It says you don't get to keep it if they want to buy it. It, what am I, what am I misunderstanding about that language? Well, I think it's, it all, I mean, it all comes down to the fact that we think the, the lack of an existence of an explicit provision requiring us to sell means that. Why isn't that the explicit provision requiring you to sell? Not because it says if, if they don't, if we don't sell it, they, then they will fail to purchase it. As long as we have a right to hold it in our, to hold it. But you're not permitted to own or assign or sell or pledge it unless they fail to purchase it. So. And they fail to purchase it by the, by our refusal to sell. Doesn't that completely negate the first part that, that, that specifically is trying to restrict your ability to continue to hold on to it and put the, put the choice in the hands of the remaining shareholders or corporation? I think, I think that's, that's a, a consequence of the fact of the way this contract was drafted. But isn't everything about, if we're trying, even if I were to think that, okay, this is a hypothetical ambiguity here that fail to purchase may not mean are derelict in their duty to purchase, but instead means unsuccessfully attempt to purchase. I think that's not an impossible reading of the language. But when that occurs in an agreement where the principal operating provision is headed restrictions on ownership and transferability, and that says that no shareholder in these categories are permitted, are permitted to continue to own this except in this particular circumstance, and where that kind of language persists throughout, the shares bear a legend on them that says don't buy this because it's not transferable except in connection with this, this agreement where there's a specific performance requirement in here that hinges on the fact that these are things that cannot be readily purchased or sold in the open market. How can it be the case that, putting aside for a moment the parallel language that we're actually concerned with here, but how could it be the case that the very provision that says you're not allowed to own this unless they fail means you have the right to make them fail and unilaterally continue to own and then assign the property? I think that's our right under the contract. Our refusal to sell is not prohibited by any word in the contract. In fact, Mr. Weinstein has conceded on the brief that there's no explicit provision requiring a sale. So, no, no, that just is triggering a question because earlier in response to my colleagues, you are a judge. You're allowed to have a question. In response to my colleague's question about the scenario if he left the company, you were clear to treat sort of subsection B of the restrictions the same as you're treating subsection A. Does that apply to subsection C as well? They're all trying to accomplish the same thing. That's where a shareholder wants to transfer shares, sell or pledge them. Well, in that case, it's the shareholder's action. So, I think they would be agreeing to sell even though the contract does not prohibit them from selling since they're deciding to sell them. They would necessarily have to be bound by those provisions. They're trying to decide to sell them outside of the IC. So, that one isn't- They can hold them. Because there's a right of first refusal here, right? I mean, that's what I was getting at. You said there's nothing in the contract that requires anybody to sell. And actually, I read the right of first refusal as saying, well, if you're going to sell, you're required to sell to the corporation, which feels like a significance since those are parallel. It helps us understand what's going on here. But I would get back, again, any, I mean, under the principle that what is not prohibited is permitted. There is nothing prohibiting them from keeping the shares. And if you look at the language, it's an obligation to purchase, which in itself is one removed from actual action. Can I just be clear? I think I understand what you're saying. And I understand what the procedural posture of this is. That both sides moved for judgment on the pleadings. And you are saying you are entitled to judgment on the pleadings as a matter of law. Do you have a fallback argument that this is somehow ambiguous and you'd like to look at extrinsic evidence? Yes, Your Honor. And that's in our brief.  Yes. Okay. Do you think you have extrinsic evidence that shows that your interpretation of the contract was the shared understanding of the shareholders? I don't have gotten that far, Your Honor. Okay. In fairness. Got it. You don't have any of your own. Maybe you haven't gotten anything from them yet on this. In discovery. This was created in 1966.  And then even amended in 2003, which was a long time ago. In fairness, since the senior misbehavior guard has passed, the only evidence you could have, presumably firsthand evidence, non-hearsay evidence, would have to come from the other shareholders, or surviving shareholders. That's the most likely result. Yeah. Okay. Got it. Just one other point to make is that an obligation to purchase doesn't say you have to purchase. Right. I think we got you on that. We're going to hear from you again on rebuttal. So let's go ahead and hear from Mr. Weinstein. Good morning, Your Honors. May it please the Court. My name is Fred Weinstein. I represent the appellee, Neville, Rodia, and Shaw, Inc. The district court got it right here. And obviously, the court was tasked with looking at this agreement and determining on the basis of the two motions that were made for judgment on the pleadings, whether there was any ambiguity. And if there was no ambiguity, what did the agreement require? And the only scenario set forth in this agreement where the estate would have the ability, the right to sell to a third party was a very, very narrow one. And that set of circumstances were not, as was suggested below and again here today, that the estate of Mr. McGurk would say, we're just not going to, we're going to refuse to sell it to you. It was a scenario that required the corporation first to purchase the shares of the decedent as soon as practicable. And if the corporation couldn't do that, then the remaining shareholders would have the opportunity to purchase it on a pro rata basis or any other basis they might agree. And they had to do it within 60 days of the death of the shareholder. And then if that didn't happen, the corporation, and again, what's clear from this agreement is the failure on the part of the corporation to do these things was to be a failure because of the lack of surplus. And if they didn't have the surplus needed to make the purchase immediately, this agreement required them to do very specific things so that they would be in a position to purchase these shares. It indicated very explicitly that there could be no declaration of dividends, that payment of salaries and bonuses were to be restricted to 80% of debt income. And if at the end of a year, they were still not in a position to purchase it, then and only then would there be the opportunity on the part of the estate to sell it to a third party. But the corporation still, under this agreement, had the obligation to purchase if that didn't close. So when you look at all these provisions, as the district court did, the inescapable conclusion is you can't read them all together and make sense of them if effectively the estate could sabotage this thing and say to the corporation, we're not going to sell it to you. And the court correctly concluded this was a mandatory buyout situation. There's all kinds of restrictions, as the court has noted here, that covers not only the estate, but it applied to shareholders who were no longer an employee. It applied, as was indicated, circumstances where a shareholder made a decision they wanted to sell the stock. These restrictions were designed clearly, as the district court noted, to ensure that the very thing that's being advanced here couldn't happen unless the corporation failed to exercise its rights. And as was also observed correctly, this agreement had a specific performance provision. That specific performance provision did not only indicate there was a right of specific performance to require the purchase, it also says there's a right of specific performance as it relates to the sale. So, Your Honor, I'm going to rely on our brief unless there are further questions. I appreciate the time. Thank you. Thank you. Mr. Dorkey, you've got three minutes. I'll need less than that, Your Honor. Very quickly, there's no restriction on our ability to hold these shares. Our client is interested in holding the shares, not necessarily selling the shares. In order to give Nelson Rode, Neville Rode, what they want, you have to read provisions into this contract. You have to take out the word obligation to purchase, as I was going to say, and obligation to purchase doesn't mean that you actually purchase. If I lend somebody money and they give me an IOU, I lend them a hundred bucks, they don't have to pay it. They have an obligation to pay it, but not until I ask them. And that's what's happened here. Or you could have a counterpart provision that said, the corporation shall purchase and the shareholder shall sell. That's in some of the cases. And the third thing they could have done is you could have had recitals incorporated by reference and made it clear what these provisions are for, so they're just not trying to be derived from the four corners of the document. Thank you for your time, Your Honor. One just totally idle curiosity question. What does this company do? It manages assets under management. Financial services. Financial services. Okay, thank you. Yes, thank you. It's outside the record, I hope. Yeah, it's not relevant to anything. It's just sort of odd to read all these briefs and not have any idea what this is actually doing. Thank you for your arguments. We appreciate it and we'll take it under advisement.